# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**BEVERLEY ANNE DOUGLAS,**

    **Plaintiff,**

**-vs-**               **Case No. 6:10-cv-1327-Orl-28KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

  This cause came on for consideration without oral argument on the Complaint filed by Beverley Anne Douglas, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 14, 15.

## I. PROCEDURAL HISTORY.

  In September 2006, Douglas applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act). R. 162-68. She alleged that she became

disabled on July 4, 2006. R. 162, 166. Douglas's applications were denied initially and on reconsideration. R. 92-99.[1]

Douglas requested a hearing before an administrative law judge (ALJ). R. 122. An ALJ held a hearing on May 19, 2009. Douglas, represented by an attorney, testified at the hearing. Robert Bradley, a vocational expert (VE), also testified. R. 66-91.

After considering the testimony and the medical evidence presented, the ALJ determined that Douglas was insured under OASDI through December 31, 2009. R. 20. The ALJ found that Douglas had not engaged in substantial gainful activity since the alleged onset date of her disability. *Id.*

The ALJ concluded that the medical evidence showed that Douglas had diabetes mellitus, hypertension, obesity, affective mood disorder and sleep apnea, which were severe impairments. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations. R. 20.

The ALJ found that Douglas had the residual functional capacity (RFC) to perform light work,[2] except that she had the ability to perform only unskilled or semi-skilled work. R. 22.

With respect to her mental impairment, the ALJ found that Douglas had mild restrictions in activities of daily living, moderate difficulties in social functioning, mild difficulties with

---

[1] The record reflects that Douglas filed earlier applications for OASDI and SSI benefits. An ALJ found that she was not disabled in a decision dated July 3, 2005. R. 182-87. It does not appear that Douglas sought review of that decision.

[2] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567, 416.967.

concentration, persistence and pace, and that she had experienced one episode of decompensation of extended duration. R. 21. The ALJ found that the objective evidence did not support Douglas's testimony about the severity of her mental impairment. R. 22-23. He found that Douglas's mental impairment was not disabling because (1) treatment was generally successful in controlling her symptoms, and (2) medications had been relatively effective in controlling her symptoms. R. 23.

In reaching this conclusion, the ALJ did not give great weight to the records of Douglas's treatment at ACT Corporation. He also assigned little weight to the November 30, 2006 psychiatric evaluation performed by Sandra Brooks, an ARNP working at ACT Corporation. The ALJ stated that because an ARNP was not an acceptable medical source under the SSA regulation, he could not rely on her opinion as to the claimant's condition. R. 24.

The ALJ concluded, based on the record and testimony at the hearing, that Douglas could perform her past relevant work as a conference service coordinator. R. 24. He noted, also, that the VE identified a number of unskilled and semi-skilled occupations that Douglas could perform in light of her RFC. Therefore, the ALJ concluded that Douglas was not disabled. R. 25.

Douglas requested review of the ALJ's decision. R. 8. On July 7, 2010, the Appeals Council dismissed her request for review because it was not timely filed. R. 4-5. It notified Douglas that she could seek review by filing a complaint in the United States District Court within sixty days. R. 1. Douglas timely sought review of this decision by this Court. Doc. No. 1.

## II. JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III. STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

>  (1) Is the claimant presently unemployed?
>
>  (2) Is the claimant's impairment severe?

> (3) Does the claimant's impairment meet or equal one of the
> specific impairments set forth in 20 C.F.R. Part 404, Subpart P,
> Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the
> economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**IV. STATEMENT OF FACTS.**

After thorough review of the record, I find that the parties have summarized many of the relevant facts. Because Douglas challenges the ALJ's decision only with respect to her mental

impairments, I will summarize only the records relating to those impairments to protect Douglas's privacy to the extent possible.

A. *Personal Information and Work History.*

Douglas was born in 1956. R. 166. She had been molested and attacked when she was a child. R. 71, 87.

Douglas received an Associate Science degree from a junior college. R. 69. She worked for fifteen years for AT&T as a teleconference specialist. R. 69, 198. In this job, she was required to stand or walk one hour and sit seven hours a day. She lifted less than ten pounds. R. 198. There is no description in the record of the mental demands of this work. However, two disability adjudicators and the ALJ who decided Douglas's first disability application described the job as semi-skilled.[3] R. 186, 220, 238.

When Douglas's office was moved, a nearby chain link fence with barded wire on it brought back memories of the violence in her past, which triggered a mental breakdown. R. 71. AT&T apparently put her on short-term disability while she sought treatment. R. 71-72. When she was unable to return to work, she lost the job with AT&T. *Id.* After that, she moved to Florida. R. 73.

B. *Treatment Records.*

In Florida, Douglas received primary care treatment at the Halifax Health Center. On January 9, 2006, she reported having anxiety and panic attacks as well as depression. R. 289. She

---

[3] The disability adjudicators and the ALJ all opined that Douglas could not return to her past relevant work. R. 186, 220, 238.

-7-

was treated with Effexor. R. 286. As of February 27, 2006, Douglas reported that she was feeling better, but she was still depressed and staying in her bedroom. R. 285. On May 1, 2006, her physician increased the dosage of Effexor. R. 283. She reported no suicidal ideations in June 2006. R. 281.

On August 9, 2006, Douglas complained of depression with suicidal ideation. She had not taken her medication for three or four days. She was voluntarily admitted for treatment from August 10, 2006 through August 23, 2006. R. 271, 278. Gary Frick, M.D., examined Douglas. He observed that she was dysphoric, with positive suicidal ideations. Her attention, concentration and insight were fair, but her judgment was poor. His impressions were that Douglas suffered from major depression with a global assessment of functioning (GAF) score of 20-30.[4] R. 309. On August 23, 2006, Douglas stated that she was no longer suicidal and that she was tolerating her medication without side effects. She was discharged, at her request, with the medications Effexor and Klonopin. Her GAF score at discharge was 45.[5] R. 306.

On September 18, 2006, Douglas continued to complain of depression with suicidal ideation, although she said that her mood was improved and that she did not have suicidal

---

[4] The Global Assessment of Functioning (GAF) scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th Ed. 1998) (hereinafter *Synopsis of Psychiatry*). A score between 21 and 30 is defined as behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends). *Id.*

[5] A GAF rating of 41-50 reflects "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Synopsis of Psychiatry* at 299.

thoughts while taking her medication. R. 277. On September 20, 2006, she reported that the medicine was helpful until her mother upset her. R. 305. Her mood was still depressed on November 13, 2006. R. 276.

Douglas also obtained mental health treatment at ACT corporation (ACT). On November 30, 2006, Douglas reported that her mood had improved but Sandra Brooks, ARNP, observed that Douglas was anxious and reported being fearful of people. The diagnoses were major depressive disorder, recurrent, panic disorder with agoraphobia and post traumatic stress disorder (PTSD), with a GAF score of 45. R. 304.

On February 6, 2007, Michael Zelenka, Ph.D., prepared mental RFC assessments for Douglas (Exhibits 5F and 6F). While the ALJ wrote that Dr. Zelenka examined Douglas, *see* R. 22, it appears that his opinion was, in fact, based only on a review of Douglas's records, *see* R. 324, 328. Dr. Zelenka opined that Douglas would have mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence and pace, with one or two episodes of decompensation of extended duration. R. 322. He further opined that Douglas would be moderately limited in her ability to do the following: understand, remember and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, interact appropriately with the general public. R. 326-27. Dr. Zelenka wrote that "given only simple instr[uctions] to carry out, limited public contact, and with some allowances for occasional psychol[ogical] prob[lem]s, [Douglas]

-9-

retains adequate mental ability to carry out simple instr[uctions] and to relate adequately to others in a routine work setting." R. 328.

Douglas continued out-patient treatment at ACT. Individualized treatment plans were prepared, some of which refer to Lilly Ritterbeck, M.D. R. 423-26, 455-57, 465-68. On February 16, 2007, a physician at ACT whose name is illegible examined Douglas. Douglas reported some improvement but still feeling withdrawal, anhedonia, and irritability. The physician observed that Douglas was mildly depressed with an appropriate affect and no suicidal ideation. The diagnosis was major depression, recurrent with a GAF score of 48. He added Wellbrutin to her medication regime. R. 358.

On June 15, 2007, Douglas reported that she was feeling better, but she stated that she did not trust anyone. R. 427. The treating professional noted that she was anxious. R. 428. The diagnosis remained major depression, recurrent, with a GAF score of 50. R. 427.

On May 31, 2007, Alejandro Vergara, M.D., prepared mental RFC assessments (Ex. 11F and 12F). Once again, the ALJ wrote that Dr. Vergara examined Douglas, *see* R. 23, but the record appears clear that Dr. Vergara based his assessments only on a review of Douglas's records, *see* R. 386. Dr. Vergara opined that Douglas would have mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence or pace. He found insufficient evidence to opine regarding episodes of decompensation. R. 384. Dr. Vergara further opined that Douglas would have moderate limitations in the ability to do the following: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without

being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. R. 388-89. Dr. Vergara wrote, "Considering claimant's longitudinal history and information in file, it is indicative that 'she retains the mental capabilities, necessary to at least do simple, repetitive type tasks and assig[n]ments.'" R. 390.

In December 2007, Douglas stated that she had been having suicidal thoughts recently. An ACT physician whose name is illegible diagnosed major depression, recurrent with a GAF score of 48. R. 469.

On January 16, 2008, Douglas complained of increased anxiety. R. 440. However, on April 21, 2008, she reported that she was doing well. The diagnosis remained the same, but her GAF score was 60.[6] R. 458. Her condition deteriorated as of July 2008, when a physician at ACT whose name is illegible determined that Douglas still had major depression, recurrent with a GAF score of 47. R. 463. By August 28, 2008, she was again doing better, with a GAF score of 60. R. 500.

In September and October 2008, Douglas reported being depressed with suicidal thoughts. R. 478-80. An ARNP at ACT rated her GAF score as 45. R. 498. Abilify was added to her medication regime. R. 478.

---

[6] A GAF score between 51 and 60 is defined as: "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers)." *Synopsis of Psychiatry* at 299.

In November 2008, Douglas reported significant improvement in her mood with use of Abilify. She had begun working around her house and even began singing again. R. 477; *see also* R. 496. In January 2009, Douglas indicated to an ARNP at ACT that she was "[d]oing great." The diagnosis was major depression, recurrent and severe, with a GAF of 50. In March 2009, Douglas again reported thoughts of suicide if her disability applications were not approved. An ARNP at ACT rated her GAF score as 50. R. 504.

On May 18, 2009, J. Jeff Oatley, Ph.D., examined Douglas at the request of the SSA (Exhibit 22F).[7] Dr. Oatley observed that Douglas's mood was appropriate but her self-esteem was low. R. 510. He did not note any concentration difficulties or memory deficits when administering psychological tests. Her attention span was also appropriate. She reported that she had a friend with whom she had telephone contact. She was self-sufficient in activities of daily living. R. 511-12. Dr. Oatley's diagnosis of her mental impairment was social phobia "indicated by a marked and persistent fear in social and performance situations, leading to avoidance of performance and social situations, or endurance with anxiety of such situations." R. 511. He also diagnosed a dysthymic disorder "indicated by years of feeling sad, low self-esteem, sleep difficulties, and feeling helpless." *Id*.

In a mental RFC assessment, Dr. Oatley opined that Douglas would have moderate limitations in the ability to do the following: understand, remember and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the

---

[7] In part of his decision, the ALJ referred to this evaluation as having been conducted by Beverley Douglas, Ph.D. R. 23. This is obviously a typographical error.

-12-

public, supervisors and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting." R. 513-14. She would have mild limitations in the ability to understand, remember and carry out simple instructions and make judgments on simple work-related decisions. R. 513. He wrote that her social/performance anxiety impaired her functioning as indicated in the mental RFC assessment. R. 513-14.

    *C.    Claimant's Statements Regarding Functional Limitations.*

After Douglas was released from her inpatient treatment in 2006, she took prescribed medications, which improved her outlook on life. R. 75. She continued to have suicidal thoughts from time to time, however. R. 76-77, 87-88. She did not sleep well, and she cried a lot when she was not taking her medication. R. 77.

Douglas had panic attacks, particularly when her mother made her go to a store. R. 78. She did not like to be around a lot of people. R. 81, 86-87. She no longer attended church. R. 86. She did not respond well to criticism. R. 85. Panic attacks caused chest pains, for which Douglas took nitroglycerin. R. 80.

Douglas had problems with short and long-term memory. R. 81. She could not concentrate sufficiently to follow the plot of a television show. R. 82. Her mother had to remind her of appointments. R. 84.

During a typical day, she stayed at home, where she lived with her parents. R. 79. She did not like to go outside. R. 86. She was able to care for her personal hygiene. R. 82. She also made breakfast, washed dishes and did vacuuming and dusting. R. 84. She talked with a friend on the telephone. R. 86.

-13-

*D.     VE Testimony.*

The VE testified that the *Dictionary of Occupational Titles* (DOT) listed approximately 6,000 light and sedentary, unskilled and semi-skilled occupations. R. 89. These jobs would permit an employee to be absent only one day a month. R. 90. Neither the ALJ nor Douglas's attorney asked the VE to opine about the mental requirements of Douglas's past relevant work or about what work Douglas could perform in light of her RFC.

**V.     ANALYSIS.**

Douglas challenges the ALJ's decision regarding the functional limitations arising from her mental impairments. Specifically, she contends that the ALJ did not explain the functional limitations arising from his finding that she would have moderate difficulties in social functioning and mild limitations in concentration, persistence and pace. She submits that the ALJ erred with respect to his consideration of treatment records from ACT, including the records of Dr. Ritterbeck and ARNP Brooks. Finally, she argues that the ALJ erred by failing to consider the GAF scores in his analysis. These are the only issues I will address.[8]

*A.     Consideration of the ACT Treatment Records.*

The ACT treatment records are included in Exhibits 4F, 9F, 15F, 18F, 20F and 21F. *See* Court Transcript Index. The ALJ wrote that he did "not assign great weight" to these records because the "treatment has been essentially conservative in nature" and "does not indicate a level of severity to the claimant's impairments consistent with the allegation [that she is disabled]." R.

---

[8] The parties were advised that issues not specifically raised would be waived. Doc. No. 16 at 2.

24. The ALJ cited selectively to some of the ACT records. He did not mention the findings by any treating physician at ACT. He indicated that he legally could not rely on ARNP Brooks assessment of Douglas performed on November 30, 2006 because she was not an acceptable medical source. R. 24.

Douglas argues that the ALJ should have stated what weight he gave to the opinions of Dr. Ritterbeck. He does not cite to any record evidence showing that Dr. Ritterbeck examined Douglas or rendered an opinion regarding her functional capacity. The Court has located only treatment plans that reference Dr. Ritterbeck. Under these circumstances, the failure to identify Dr. Ritterbeck individually and state the weight given to the treatment plans is harmless, at best.

The Commissioner concedes that the ALJ's statement that he could not rely on ARNP Brooks's opinion is incorrect as a matter of law. While an ARNP is not an acceptable medical source, she is a source that the SSA regulations permit the ALJ to consider. *See* 20 C.F.R. § 404.1513(d)(1). The November 30, 2006 treatment record prepared by ARNP Brooks that the ALJ did not rely on is, however, consistent with other records at ACT. The ACT records reflect a consistent diagnosis that Douglas suffered from major depression, recurrent, with GAF scores reflecting serious impairments, with occasional periods of improvement to moderate impairments. Because the ALJ considered the ACT records as a whole, his legal error with respect to ARNP Brooks's opinion also appears to be harmless.

Douglas also contends that the ALJ should have recited all of her GAF scores and indicated the weight given to them. The cases she cited in support of this argument do not support her position. In *Davis v. Astrue*, 287 F. App'x 748 (11th Cir. 2008) and *McCloud v. Astrue*, 166

F. App'x 410 (11th Cir. 2006), the Eleventh Circuit found that the ALJs erred in the way each of them construed GAF scores. In *Davis*, the court found that the ALJ erred because he misinterpreted a treating physician's records as being inconsistent with the assigned GAF score. In *McCloud*, the court found that the ALJ erred in stating the level of impairment associated with a particular GAF score. There is no indication in the present record that the ALJ misunderstood or misinterpreted the GAF scores. Neither of these decisions stands for the proposition that an ALJ must state the weight given to GAF scores.

      *B.     Mental RFC and Ability to Work.*

The ALJ found, among other things, that Douglas would have moderate limitations in social functioning. He did not explain how that moderate limitation translated into his residual functional capacity assessment. He also did not inquire of the VE how moderate limitations in social functioning would affect the availability of jobs Douglas could perform.

Social functioning addresses a person's ability to interact with the public, get along with coworkers and peers, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior. *See, e.g.,* R. 327. Accommodations for moderate limitations in social functioning may include, for instance, requiring that the person work in a job with "limited public contact." *See* R. 328. It may also sometimes be translated into limitations on the skill of the job to be performed, such as a requirement that the person perform only simple tasks. *See* R. 513.

The Commissioner argues that the ALJ incorporated his finding that Douglas would have moderate limitations in social functioning into the RFC through the limitation to unskilled work.

*See* Doc. No. 19 at 11 ("Thus, according to Dr. Oatley, Plaintiff's social functioning and her ability to maintain concentration, persistence, or pace was sufficient to satisfactorily perform unskilled work."); Doc. No. 19 at 18 ("Thus, consistent with the ALJ's RFC finding, Plaintiff could perform unskilled work and could satisfactorily interact with supervisor's, co-workers, and the public."). This argument is not persuasive because the ALJ did not limit Douglas to unskilled work; he also included semi-skilled work in his RFC assessment.

Additionally, the ALJ did not develop the mental demands of Douglas's past relevant work. Douglas testified that she could not return to that work after her mental breakdown, which provides some evidence that there were mental functional requirements with that job. Without knowing what those mental functional requirements were, there is insufficient information to determine whether Douglas could perform that work in light of the ALJ's RFC determination.[9]

Because the ALJ did not explain how Douglas's moderate limitations in social functioning would affect her ability to perform work-related activities and did not develop the record regarding the mental functional requirements of Douglas's past relevant work, there is insufficient information for the Court to conclude whether the ALJ's determination that Douglas could return to her past relevant work was rational and based on the correct application of the law. When, as here, "the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some rationale might have supported the ALJ's

---

[9] The ALJ also did not explain how Douglas's mild limitation in concentration, persistence and pace affect her ability to perform work-related activities. While a limitation to unskilled work may be the functional limitation arising from mild limitations in concentration, persistence and pace, the better practice would be for the ALJ to state that finding explicitly.

conclusion.'" *See Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, (11th Cir. 2011) (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Therefore, I respectfully recommend that the Court reverse the decision of the Commissioner and remand this case.

  C. *Remand for Further Proceedings Or an Award of Benefits.*

Douglas requests that the Court reverse the Commissioner's decision and direct the SSA to award benefits to her. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).

In the present case, the Commissioner must be given another opportunity to determine Douglas's RFC and provide support for that determination. He must also further develop the mental demands of Douglas's past relevant work. Until these determinations are made and the analysis is completed through step five of the sequential evaluation process, the record does not show without doubt that Douglas is disabled. Accordingly, remand for further proceedings is required.

On remand, the Commissioner should follow the Eleventh Circuit's instructions in *Winschel* by stating the weight given to treatment records of each healthcare professional. The ALJ should also develop the record regarding the physical and mental demands of Douglas's past relevant work. While the testimony of a VE is not required at step four of the sequential evaluation, it would be prudent to inquire of a VE about the work Douglas could perform, including her past relevant work, in light of her physical and mental limitations.

## VI. RECOMMENDATION.

For the reasons set forth herein, it is respectfully recommended that the decision of the Commissioner be **REVERSED** and the case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings. I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its Order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Orlando, Florida on October 12, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE